We're back on the record in the matter of the United States. Frank Solis v. United States of America v. Millennium Pharmaceuticals has got three cases, 15-16953, 15-17055, and 15-17057. Each side has 20 minutes. I note, just before we start running the clocks, will anyone, I note, there's divisions on here with Audra Ibarra, 15 minutes, with Joseph Boussa, 5 minutes. Is that correct? Yes, Your Honor. All right. And that includes, you understand, your rebuttal time is included in that. Yes, Your Honor. Okay. And so I'm going to stop you at 15 so that the other person gets their 5. All right? Yes, Your Honor. And then on the other side, it's 10 minutes each. Kimberly Dunn, 10, and Douglas Hallward-Trameyer. Yes, Your Honor. Okay. Okay. So you each have. All right. So then we're ready to proceed. So please state your name and proceed. Good morning, Your Honors. Audra Ibarra on behalf of Relator Frank Solis. I'd like to save 5 minutes for rebuttal. Okay. The procedural posture of this case is that the district court denied the defendants' motions to dismiss under 12b6 and 9b, but the district court dismissed this case as barred by prior public disclosure. Mr. Solis appeals the dismissal of his case, and the defendants cross-appeal the denial of their 12b6 and 9b motions. The drug Integrolin can kill a patient if it's used in the early treatment of severe patients suffering from severe heart attacks or in combination with certain other drugs. It increases the risk of internal bleeding and the need for transfusion and ultimately death. Still, the defendants in this case made at least $400 million off of such off-label uses that were not approved by the FDA. They did this by paying kickbacks to doctors and to hospital staff to use Integrolin in this unsafe way. We got the allegations. Yes, Your Honor. Okay, we got the allegations. I have three points to make, Your Honor, today. First, that the district court erred as a matter of law when it dismissed this case as barred by prior public disclosure in light of this court's new case of Hart-Pence. Okay, so Hart-Pence abrogated Wang, right? Yes, Your Honor. And the district court relied on Wang? Yes, Your Honor. All right. So you want us to vacate that part and send it back for reconsideration under Hart-Pence? I don't think you need to have it reconsidered, Your Honor, because the district court found that the other two elements for an original source exception were found. I don't think that's true. This last round? Excuse me? Did the district court make that findings on this last round? Yes, Your Honor. The district court's analysis stopped at the original source allegation because the district court found that Solis didn't have a hand in the public disclosure, and so therefore he doesn't qualify as the original source, and the analysis ended there. So, Your Honors, the court found that the case would be barred normally by prior public disclosure unless he qualified as an original source, and in this case the district court held that there were three elements to be an original source, one of them being the hand in the original disclosure. But the court did, before it reached that third element, say that the defendants conceded one of the elements, that Mr. Solis had already made a disclosure to the government before he brought this case, and that he was likely to have direct and independent knowledge given that he had been an employee of all the defendants selling their drugs. And so in that way, the court already found that he would be an original source with the exception of that one element, which is no longer an element under Hart Pass. I feel like you're over-reading what the district court said, but I'll be curious to hear what the other side says on that. Well, yes, Your Honor, and to that point, Your Honor, even if the district court didn't make that decision, Your Honors are correct that there would be a remand for the district court to decide that one element of the original source exception. Considering we changed the law after it left the district court and the district court was relying on the then law, there aren't many marks against the district court so far on that issue. Yes, Your Honor. Okay. My second point would be that Judge England correctly found that Solis sufficiently states a claim for FCA violations. And my third point, before I delve into my second one, is that even if this court were to find that Solis's complaint isn't sufficient, Solis is entitled to leave to amend his complaint under this court's recent case of United Health Insurance Company. But turning to my second point, and speaking more specifically about the allegations and the complaint about the FCA violations. When you go through this, could you make a distinction, not keeping them together, of the difference between the Avalox claims and the Endergan claims? I've looked at your file pretty closely, and it seems to me that there's a different analysis we need on each of those because they were treated differently in the pleadings in the case below. Yes, Your Honor. Thank you. So Judge England correctly found in his detailed order that the Solis sufficiently states a claim for FCA violations. More specifically, Judge England correctly found that the complaint alleges all the elements of an FCA claim based on kickbacks on both drugs, Integralin and Avalox. And as Your Honor requested, I'll go through them separately. First, on Integralin, Solis alleges that defendants paid doctors, hospitals, and medical centers kickbacks in the form of honoraria, grants, travel, speaker fees, and expensive meals. But more specifically in the allegations, he says that the defendants paid for trips to Hawaii, Denver, and Las Vegas. He says that speakers were paid $1,000 to $2,500 per event. Sometimes they spoke for 5 to 10 minutes, and sometimes they spoke not at all, but they got the money. And that meals included dinner parties at the Hard Rock Cafe for a Christmas party, dinners at Arnie Morton's Steakhouse for over $1,000, and dinner at Nobu, among others. And that doctors were paid several thousands of dollars per patient that they enrolled in studies for off-label uses of Integralin. And that defendants funneled money, funneled millions of dollars in unrestricted grant monies to the doctors. Solis also alleges that the defendants provided disremuneration to induce the use of their drugs. I noticed that you specifically, as I requested, talked about the Avalox claims. But what about the Integralin claims? But what about the Avalox claims? Okay. Specific to the Avalox claims, Your Honor, on the kickback allegations, the defendants trained and instructed their sales representatives to offer cash, trips, and meals, and gifts, and entertainment, and kickbacks for doctors to prescribe both Integralin and Avalox. The relator in this case sold both Integralin and Avalox for sharing plow and murk. The defendants also rewarded the doctors with gifts and meals for prescribing both Integralin and Avalox. And I have the specific paragraph numbers for these citations. The defendants established formal internal guidelines to award benefits to doctors pushing prescribed-to-play and quid pro quo award benefits based on prescription of both Integralin and Avalox. And honoraria and meals were given to doctors who use or would agree to use both Integralin and Avalox. The defendants' kickbacks affected the use of Integralin and Avalox in hospitals and cardiology clinics. Specifically, the defendants were told their sales reps to ask doctors for more prescriptions for both Integralin and Avalox when defendants and their sales representatives paid doctors to speak. And the sales representatives were told to hold the doctors accountable if they did not increase their prescriptions of Integralin and Avalox. Now, on the very, very specific allegations only as to Avalox, a specific dinner at Smitty's Grill was held to get Avalox on the hospital's formulary. That's paragraph 136. And that's important because that increases the likelihood that the doctors in the hospital will be using that drug. Specific lunches were made where a doctor promised to write more prescriptions of Avalox. And that's paragraph 137. And finally, paragraph 138, the defendants told sales representatives to give meals, paid speaking opportunities, paid research, and other perks to formulary committees, to hospital guidelines committees, and to put Integralin and Avalox on their formulary guidelines and standing orders and to purchase more Integralin and Avalox. So those are all the ones that specifically call out Avalox. But as the relater, Frank Solis, worked for, sharing, and sold both of them, many of the allegations combined them because he was acting, he was working on them simultaneously. Turning back to the Integralin claims, if I can. Solis also alleged that the federal health care programs paid for these drugs. More specifically, defendants targeted high Medicare and Medicaid prescribing doctors and hospitals to increase the market share within those programs. For example, defendants gave one doctor $5,000 for a cardiology seminar in Las Vegas. And to get the best return on their investment, sharing tracked hospitals by volume of Medicare cardiology patients, average length of stay, and average charge per Medicare patient. Finally, Solis alleges that defendants knowingly and willfully did those things. More specifically, defendants had a formal internal guidelines to award benefits to physicians prescribed to play in quid pro quo sales. If you want to save five minutes for rebuttal, you should wrap up. I do, Your Honor. I'd like to conclude by saying that the Judge England correctly found that all the elements were also met for a violation of the FCA based on off-label use of Integralin. Thank you. So then it's five minutes for the United States of America. As amicus curiae, please state your name and your appearance. And will you be using all your time? I believe so, Your Honor. Good morning, and may it please the Court. Joe Busa on behalf of the United States as amicus. However this Court disposes of these claims under Rules 9b or 12b-6, we urge that this Court leave open the ability of the United States, in an appropriate case, to hold liable drug companies who knowingly induce the submission of false claims in order to finance the purchase of their drugs. So just briefly, I don't think I will be using my full five minutes, Your Honor. I don't understand what you want us to do. What in a paragraph of the opinion are you asking us to say that you feel you need some type of protection out of this case? Oh, Your Honor, I'm just saying if you happen to reach some select issues in the cross appeal, we're just hoping that whatever you say in disposing of those issues, you make clear that the government has the power to hold liable a drug company who actually does induce the submission of false claims to finance the sale of their drugs. So you don't really want to do this case, but you just want to make sure we're not wrong? Well, no, Your Honor. I apologize. I should just explain a little bit. I mean, it is the general policy of the government that when a relator is conducting litigation that, you know, even if we don't take over the case and intervene, we will often appear as amicus in an effort to be helpful to the court, to point out our view of what viable lines of False Claims Act liability may exist. And so that's why I'm here. I hope I'm being helpful in that regard. And so I just want to point out two sort of anchor pole situations in which a drug company certainly could induce the submission of false claims. So the first is, imagine a drug representative going to a hospital and saying, I've got a new drug or a drug. It's not reimbursable by Medicare, but, you know, I want you to use that drug, submit a claim to Medicare, and use the payment you get to buy my drug. Now, clearly there the drug company would have approximately caused the submission of a false claim. So we're asking for preservation of that circumstance and where the inducement of a false claim is revealed by context, even if it's not said out loud. Now, we can imagine many avenues for proof of such a claim. We're sort of agnostic as to how any given relator would make out such a claim, but we just want to clarify that we think those types of claims could be viable under the False Claims Act. But we can't give you an advisory opinion. No, certainly not, Your Honor, of course. So I'm just saying if you were to reach these issues in the cross-appeal, we would ask that you reject defendants' contentions to the contrary on these matters. Okay. If there are no further questions from the Court, we would just like to thank the relators, the defendants, and the Court for the ability to participate as amicus and to present oral argument here. And I would reserve the balance of my time for later on rebuttal. All right. Fine. Thank you. Thank you very much. Okay. So then you're going to 10 minutes, right? Correct, Your Honor. Okay. Thank you. Good morning. May it please the Court. Kimberly Dunn on behalf of Millennium Pharmaceuticals. I'll be spending my 10 minutes addressing the jurisdictional issue and the public disclosure bar on behalf of the defendants. And my colleague, counsel for Sharon Plow, will address the cross-appeal. To get to the issue of what the district court decided or did not decide, the district court did not address the issue of direct and independent knowledge. There was no dispute about disclosure to the government in advance of filing the complaint. The Court need only look at the language that the Court used in referring to it appears that given the sales rate. I'm sorry. To be able to satisfy that. But there's not a finding, is what you're saying. Not a finding whatsoever. And he says it may well, but he never evaluated the issue, and that's important. Now, it's this Court has the ability, based solely on the face of the complaint, to address the question of jurisdiction. And the parties asked this the defendants asked this Court to do so because the equity supported. This case is very old. It's been 12 years since Millennium sold this drug. It's been 8 years since Schering terminated the relator in this case. You're talking now about whether we should send it back to the district court to determine whether the difference in the case in Hartpence, right? Well, Hartpence is not analogous, despite what Relator said and his reply. Well, which case are you worried about us? What are you worried about us sending back to the district court? You just want to win here, and the other side wants to win here. We want the Court to address the jurisdiction issue here and now and to finally resolve it. We urged the district court. But if I recall correctly, Counsel, in Hartpence, we remanded for the district court to make findings as to whether the Relators qualify as original sources under the now clarified, you know, two-part test. Why should we do the same in this case? We don't generally make factual findings and reach those sort of conclusions here on appeal for the first time. Hartpence involved a factual challenge where there was a question of the accuracy of what was said in the complaint. It required factual development, and the Court sent it back to the district court to, in fact, conduct that factual review. This is a case involving a facial challenge to the complaint. It can be resolved based solely within the four corners of the complaint, and the  knowledge of any fraud. There's no real dispute about the fact that there is a public disclosure. The Relator doesn't add anything genuinely new and valuable to the information that was already publicly disclosed. And the one point I do want to make sure the Court knows is that the public disclosure can be just the 2007 cases. Really, the Bentley is a portion of what those 2007 cases cover, because within those cases, the fraudulent scheme of off-label promotion with regard to Integralin and the scheme about paying kickbacks is very clearly alleged. So in that regard, the allegations in this complaint are substantially similar. It's the same parties. It's the same drug. It's the same fraudulent scheme. It's the same payers. So it's substantially similar. The question is whether — and reach a determination, and the ruling goes against the Relator in this case. Wouldn't we then have to still remand for the District Court to assess whether the District Court wants to give the plaintiff an opportunity to file an amended complaint so that he can qualify? Because the landscape of the law has changed. So as a practical matter, if we were to reach that evaluation and say, well, under this now new two-part test on the hard pens, you don't quite make it because the allegations are insufficient. Well, what about the opportunity to amend? So, you know, just as a practical matter, unless we can say plaintiff loses and amendment is futile, which is the conclusion the District Court reached, I don't know that you would necessarily prevail. You may win the war here. But then ultimately, after some long delay, while we come up with some disposition, you go below and the District Court says, well, I'll give you a chance to file another complaint to see if you can demonstrate that you're the original source under this new hard pens test. It is the Relator's burden to demonstrate jurisdiction. And I think the Relator has made clear that he has no more to offer. When he is defending, and there's been multiple opportunities for the Relator to file a complaint to. You mean the Relator said someplace, and I have nothing else to say? Well, no. But the Relator has certainly had multiple opportunities in which to add more and has chosen not to do so. Of course. Of course, under the old law, the old law. There's no new law with regard to this case. I mean, we argued direct and independent knowledge before the District Court. We urged the District Court to address the direct and independent knowledge prong. We weren't ignoring it. We saw the hard pens on Bonk Appeal. We notified the District Court it was pending. And the District Court was notified after the decision was rendered. The District Court chose to decide the case based on the prong that had been eradicated in that case. But the record is complete here. I mean, as far as the complaint, the Court can look at it, and there is nothing more that the Relator can add. He has made that clear. He doesn't say what he's going to add in his reply brief. When for the first time on appeal, he says he wants a remand. Sotomayor, the issue wasn't before him at the time because the trial court has not put the issue there. Hart-Pence's issue wasn't there. It was, Your Honor, in the sense that there were first two motions to dismiss for lack of jurisdiction. In both instances, the defendants argued direct and independent, the lack of direct and independent knowledge. Then when Hart-Pence was on Bonk. The Bonk case didn't know how it was going to turn out until we heard the En Bonk hearing and we conferenced on it and wrote an opinion. So how are they supposed to know if we didn't know? They realized that the Ninth Circuit eradicated that third prong because the En Bonk decision was rendered before the District Court decided the motion, the jurisdictional motion, and still ruled based on the not having a hand in the disclosure. So there was plenty of opportunity for the relator to know that this case was going to be premised on direct and independent knowledge. But even on appeal, relator offers nothing as to what he is going to add to this complaint. This complaint is replete with information and belief. And what the Court needs to do, and it is clear on the face of the complaint, is don't look at what he says. Look at what he doesn't say, because he does not say the facts that you would expect an insider to have if he was aware of fraud. What he says about kickbacks, he uses these general conclusory terms. I've never heard that argument when looking at the four corners of a complaint. Don't look at what he says. Look at what he doesn't say. Because the issue here is whether he has direct and independent knowledge to overcome a public disclosure bar. And what that direct and independent knowledge must be is knowledge of fraud. And all this relator does is throw about conclusory language. He talks about there being an intent to induce, but he doesn't offer one fact showing that there is an intent to induce. Even for the few meals that he does talk about, which he organized, he doesn't say that he had an intent to induce. So everything is based on his say-so, and he offers no reason to believe that the doctors in this case would not otherwise have prescribed Integralin. In fact, he concedes that in some institutions the use of Integralin was standard of care. And the same holds true with the off-label notion allegations. He is speculating that the doctor's off-label use was due to company conduct and not science. There is nothing wrong or nothing that shows fraud from the dissemination of truthful and non-misleading clinical data. And that's what he alleges, that he was trained with studies that were published in peer-review literature, peer-review journals. He doesn't give any examples of promotional conduct that occurred in the field. When he does point, and he points to nothing with regard to Millennium. So it's barren as far as any field activity. But with regard to shearing, he points to an MSL letter that discloses the safety risks, that reports accurately on the science. He suggests it was used in 2009, but it's an undated template, so it's not clear from that perspective. And if you look at the allegations in the complaint, you only need to look at it, by way of example, I'd like to offer two paragraphs. If you look at paragraph 84, it starts with a sweeping allegation of kickbacks and it ends with a factual proffer that a doctor asked to be a speaker. There is nothing that suggests fraud in that regard. Roberts. Is your argument different, whether we're talking about Avalox or Integralin? Blatt. The public disclosure argument does not pertain to Avalox. We did not move to dismiss for lack of jurisdiction on Avalox, and so this only reaches the Integralin claims. So when we write this opinion, assume we're going to write this opinion, we can count upon that concession you've made? It's not a concession. We didn't move. It doesn't apply to Avalox. I mean. Absolutely. It does not apply to Avalox. Correct. I see I'm out of my time, so I would just urge the Court to resolve the issue of jurisdiction here and now. This is an old case. The parties tried to get the district court to decide the direct and independent knowledge, and it can be decided based on the base of this complaint. Thank you. Okay. So we'll leave 10 minutes for this side. We set it for 10. Thank you, Your Honor. Doug Hallward-Durmeier on behalf of Defendants Schering-Plough and Merck. We also urge the Court to resolve the question whether there is jurisdiction, because if there is jurisdiction over this case, it is critical that the Court reach and correct the erroneous decision of the district court that allows a claim based on fraud by hindsight to posit liability based upon the dissemination of peer-reviewed scientific research published in national articles. And that is what the district court did in ruling and denying the 12b-6 motion. Do you agree with your predecessor that we need to only think of vacating the dismissal as too integrative? Your Honor, yes. The allegations with respect to Avalox, there was no motion to dismiss on jurisdictional grounds. That appeal is here properly before this Court on the substance. But if I could just to bring a point to the nature of the allegations and that this relies on fraud by hindsight and that the district court accepted that as a basis for alleging FCA liability, paragraphs 51 through 53 of the complaint say that the published scientific results from 2001, 2005, 2006, there are three paragraphs. They each recount the same things as to each. They say those studies claimed that STEMI patients who received off-label integralin early had improved blood flows. This is not our characterization. The complaint acknowledges that the studies claimed that there were better results for patients coming in with severe heart attack. A STEMI patient is a patient for whom blood flow to the heart is cut off, the most serious heart attack. And these three studies each claimed that they had observed that there was increased blood flow to these most serious heart attack victims when an earlier dose of integralin was administered. There's no allegation that these were misreported. These were the study results. The allegation of fraud is based on the next paragraphs, paragraphs 58 and 59. And each of those paragraphs says about two different 2009 studies. A 2009 study showed that Shearing never should have sold integralin for treating STEMI patients. That is by its terms fraud by hindsight. And I'm not selecting this paragraph. The district court at SER pages 7 to 9 is describing the allegations, focuses on these allegations in paragraphs 58 to 59 related to the 2009 studies. It cannot be, and it would raise serious First Amendment concerns, and that's the reason we alluded to the First Amendment issues in this case. If there could be false claims act liability on the basis of a manufacturer sharing scientific studies with doctors so that they could make the best informed decisions for the health of their patients, and it does not suffice to say, but later studies in 2009 reached different results, or at least that's the allegation. We disagree with that interpretation of the 2009 studies. But even on the allegations, it's merely that later science cast doubt on earlier studies. And under the standard of reimbursement under Medicare, and this is confirmed by the United States brief at page 5 in footnote 2, for drugs, whether it be inpatient  or inpatient, it is not liability. Necessarily, that is a certification made by the doctor or hospital only on the basis of the science at the time. It can't possibly be that a doctor who uses radiation on a cancer patient is later accused of false claims act liability because subsequent science comes up with a chemical means of treatment as opposed to radiation. It has to be on the basis of the science at the time. So this is the idea that the district court cites to this fraud by hindsight allegation in paragraphs 58 to 59 to say, but he alleges fraud is a serious, serious problem for this pharmaceutical industry to the extent that it suggests that this kind of fraud by hindsight liability can be premised on redistributing journal articles, not in any appropriate way, not to misrepresent their results. Now we accept the argument you just made. How would that affect the decision we're going to make? Well, Your Honor, this is one of the reasons I think it's important for the court to grapple with the jurisdictional arguments. Again, we have not made, we've not asserted factual disputes. We've not asked the court to take judicial notice. And certainly Relater hasn't made any factual allegations that would need to be resolved by this court or the district court on the question of independent, direct and independent knowledge. It's his own allegations, and his own allegations don't show that. Here's what I find most telling. But just go back with me a minute. You obviously are trying to get us to say something in the opinion based upon your argument. If we bought your opinion, how would it change? How would that focus in the opinion we wrote? Well, Your Honor. What issue would it deal with? Well, I think that one way to address it is with respect to even the issue of direct and independent knowledge that's before the court. I think to point to the fact that although there are these allegations of fraud, those are really just conclusory. And that the So is your position inconsistent with what the government, the government on amicus said? Well, what you're asking us to write, is it inconsistent with what they're asking us? I think it is. I think that on this issue, Your Honor, I didn't hear any space between us. We don't disagree with what the government said, that if a manufacturer goes and falsely represents that something is reimbursable, that that would be a basis of liability. Here, what is alleged is that we distributed truthful, non-misleading information that would satisfy the standard, medically reasonable and necessary under the standard that it enforced. I think there are some differences that we have in other cases with the government. But here, there's no basis to conclude that there's any fraud, much less that he has direct and independent knowledge of fraud. When the only allegation he makes, that the product was distributed for these off-label uses as to which the 2009 studies cast doubt, are made on information and belief. There are only two paragraphs of the complaint on information and belief, and both of them are with respect to the allegations that there was ongoing promotion after the 2009 studies. And what issue do we have that's before us that this would affect? I think that would go to the direct and independent knowledge that is part of the jurisdictional inquiry that my co-counsel was addressing. So I think you can address that. You mean the one we would send back, we may send back under hard case? Even if you sent that back, I think that it's relevant to that. And I think it would be very important to point that out, that it would only be with respect to continued promotion after the 2009 studies, that there could be fraud. And that he doesn't allege that because those two allegations are based on information and belief. Those are paragraphs 62 and 97. And in your brief to us, what issue did you raise this under? In your statement of issues that you're raising before our Court? We raised both, this under both direct and independent knowledge. We argue that he does not have direct and independent knowledge of any actual fraud. And then we also raise it under falsity. Because I think if you get to substance, it fails as a matter of 12b-6. I do want to, with respect to Avalox, which the Court acknowledged, there is no question about jurisdiction over Avalox. The specific allegations with respect to Avalox set aside conclusory ones that don't allege the who, what, when that Frazier and Ebbitt require that it allege. The specific allegations are at paragraphs 135 to 137. And these include one dinner and one lunch. I would direct the Court to ER-512, which is a summary of the dinner. And it says, Discussion revolved mostly around differences between Avalox and Levokin. So in other words, substantive discussion about the merits of the product. There's no reference to how much this dinner cost. There's a, he says expensive. That certainly does not meet this Court's standard in Ebbitt and Frazier for the pleading that the gentleman made. And that deals with the Avalox? That's Avalox, Your Honor. Not the Integralin? No. And Integralin, Your Honor, I would just point out that, again, the allegations and this is true of the off-label, it's true of the Avalox, it's true of the Integralin kickback. In every instance, there is general language. There are five paragraphs that use the phrase quid pro quo. That's a recitation of the legal standard. But where he gets more specific, not talking about doctors and quid pro quo, but specific doctors and specific hospitals, all we have are lunches for under $300 for 20 people. That's less than $15 a person. Or there are allegations of $1,000 dinner, but there's no statement of how many people. If that's $50 a person, hardly too excessive. They say $1,500 to pay a speaker. Unless Judge Wallace has additional questions, I'm going to ask you to bring it to a close. I would just say that with respect to the one speaker where there's no allegation of kickback, it's Dr. Gibson from Harvard. He's alleged to have been paid $2,500. The doctors that were later dealt with were all paid less than that. So in order for it to be a kickback, it has to be to compensate them for the prescriptions, not to compensate them for their time away from their practice and families. Thank you, Your Honors. Thank you. Your Honors, on the issue of the original source exception to the public disclosure bar, assuming there was not a decision on the element of direct and independent knowledge, Judge Nguyen is right that it should be sent back under Hart-Pence for the district court to decide that issue and to decide whether, if it does find that that relator didn't have direct knowledge. So what more evidence are you going to put on when you go down below? Your Honors, on evidence of this case, well, Your Honors. No, in light of Hart-Pence, so that you're going to prevail. Yes, Your Honors. Because they're saying all the evidence is there that we can, as a matter of law, make a decision with the new law. I think that's a bit of a misstatement by them, because the entire complaint was actually, with the exception of a few paragraphs. OK, so what more evidence are you going to put on? Don't talk around me. Tell me what more evidence you're going to put on. Well, Your Honors, we would add allegations on what his role was there at sharing Plough and Merck and Millennium, and how it is that he came by the information that he had in the complaint. How he knew about the ROI, the things that were attached to the complaint as exhibits, the ROI on who to target for sales. The studies on which hospitals and doctors use the most Medicare and Medicaid for reimbursement, on the plans that he was given by the defendants for pay-to-play and quid pro quo sales. We would make the bridge between the documents that were attached to the complaint to his direct and independent knowledge. But more specifically, the complaint does say all the facts are based entirely on his personal information, personal knowledge, and documents that he was in possession of. He was in possession of these documents because he worked there. So we believe that the relator, in fact, does have direct and independent knowledge as it is. But if the court remands and it finds that it doesn't, the relator would be able to add the bridge between the documents that he had to his allegations in the complaint and explain how it is that he was given them by the defendants. Turning to the FCA violations based on promotion of off-label use of IntegraLyn, defendants argue that, essentially, that its liability is barred by the First Amendment. And that's not true. I mean, it's misleading because the defendants actually made misleading statements about the use of IntegraLyn on its safety and efficacy. But more importantly, defendants are minimizing what their fraudulent conduct was. And more specifically, the fraudulent conduct wasn't just speech. And it wasn't limited to after 2009, as the defendants say. So in this complaint, Judge Englund correctly found that a claim was stated for an FCA violation based on off-label use, promotion of off-label use. And more specifically, in his complaint, Solis alleges that the defendants engaged in fraudulent conduct. They made false statements about safety and efficacy and that they paid doctors for biased studies to promote off-label use of IntegraLyn. Sharing chose their doctors for studies based on return of investment, paying doctors with the highest IntegraLyn prescription volume. On some of the studies, defendants' own employees were the researchers on the project. Independent studies show that there's a significant risk of bleeding and need for transfusion when IntegraLyn is used in the treatment of severe heart attack patients. And that's the one that they referred to, which came at the beginning of 2009. But as early as 2006, the doctor to whom the last speaker referred to, wrote a study showing that bleeding increased when IntegraLyn is used in combination with other drugs. And that's 2006. So that's a lot earlier than the defendants' claim that they knew. But if you read the complaint, you will see that part of the guise of giving money to doctors and hospitals as kickbacks were they were saying they were participating in studies. If the defendants were truly doing studies, they would have known of these drugs even before 2006. Irrespective, even after 2006, the defendants continued promoting IntegraLyn in a manner described through Solis's departure in 2010. And the defendants trained their sales representatives to promote this off-label use of IntegraLyn. Defendants sponsored seminars to promote this off-label use. They paid kickbacks, as I've already discussed. And they accessed confidential patient data to help hospitals identify patients for IntegraLyn use. They did all of that after 2006, and certainly beforehand when they were doing their own studies. Now, defendants make a big deal about fraud in hindsight only looking to the fact that they were handing out old articles. But the bottom line is the defendants say that they only knew in 2009, which is obviously not true based on the allegations of the complaint. But even if they knew in 2009, they should have stopped in 2009. And according to the complaint and relator Frank Solis, they kept doing it. The relator was there for a year after those studies came out. So if you look at the complaint and look at the date that he left, which is spring of 2010, and when those studies came out, the ones that even the defendants are relying on, which is 2009, spring of 2009, that was an entire year that he was there as a sales representative. And he knew that the promotions hadn't changed. The part of the paragraph that they're referring to that says on information and belief that this still continues is later on in the paragraph. It's not at the beginning when it says that that was happening when he was still there. Unless Your Honors have any questions, I'd like to close by saying the complaint is true. Yes, I have a question before you close, if you don't mind, if you'll have an interruption. Are you suggesting that we should treat both the Integralin and the Avalox the same in this argument that you just made? No, the off-label use promotion was only as to Integralin. The direct and independent knowledge discussion was to only as to Integralin. Avalox only has to do with the kickback claims, which didn't have anything to do  So you're saying from the district court as of now, of course, you still haven't put on your proof yet. You still have a long way to go. We're at the pleading stage now, but what you've been talking about essentially is the Integralin claim. Correct. Okay, and as to Avalox, do you also have a claim against Avalox? Well, yes, Your Honor. The claim is based on the allegations and the complaint, which were, as I said later, works for both of them. And a lot of the allegations were jumbled up and they said the drugs. But when they specifically referred to Avalox, I already read those too, Your Honor. And so we believe that we have a claim regarding the drug Avalox and the defendants using kickbacks to sell Avalox. So they aren't joint claims. They're separate claims. Correct, Your Honor. If we decide that we need to send it back for Hartpence review in the district court, would we send back both the Avalox and the Integralin claims? Well, on the Avalox claims, since it didn't have anything to do with Hartpence or the public disclosure bar, if the court were to reverse the, excuse me, were to affirm the district court's denial of defendants' motions to dismiss on 12B6 and 9B, yes, the Avalox claims would go back, but they would be going back for discovery and to be heard on the merits for trial. Or they'd be going back for consideration under Hartpence. Avalox. There was no Hartpence issue with Avalox. So the original, the public disclosure bar only applies to the Integralin claims having to do with off-label promotion. The entire, the kickback, the kickback case has to do, sorry, excuse me, the Avalox case, the Avalox kickback case has nothing to do with prior public disclosure. What about direct and independent knowledge? What about a showing of direct and independent knowledge under the now new test of Hartpence? That doesn't relate to Avalox? No, it doesn't because there was no claim by the defendants that Avalox was barred by prior public disclosure. Because they didn't file a 12B1 on that drug. Correct, correct. So, Your Honors, you're actually in overtime. So if no one has any additional questions, I'm going to call you. Okay, thank you. On time. Thank you. All right, this matter will stand submitted. Thank you all for your argument in this matter. And court will be in recess until tomorrow at 9 o'clock. Thank you. Thank you.
judges: Wallace, Callahan, Nguyen